# FEDERAL DEFENDER SERVICES
## OF WISCONSIN, INC.
LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Joseph A. Bugni, Madison Supervisor
John W. Campion
Shelley M. Fite
Anderson M. Gansner
Gabriela A. Leija
Peter R. Moyers
Ronnie V. Murray
Tom E. Phillip
Joshua D. Uller
Kelly A. Welsh

22 East Mifflin Street
Suite 1000
Madison, Wisconsin  53703

Telephone 608-260-9900
Facsimile 608-260-9901

Mach 19, 2018

The Honorable James D. Peterson
United States District Court Judge
United States Court House 10 N. Henry
Madison, Wisconsin 53703

    Re:    *United States v. Andrew Steiskal*
              Case No. 18-cr-81-jdp

To the Honorable James D. Peterson:

    In anticipation of sentencing and in support of the parties' joint-recommendation the defense submits this sentencing memorandum. As detailed below, there are three principal reasons for the Court to follow the joint-recommendation of fifteen years.

- First, while the government and the defense approach this (and every case) from different perspectives, in this case we have arrived at the same result: fifteen years. There is a certain and undeniable value to following a joint-recommendation.

- Second, while both sides agree that what Steiskal did is horrendous and rightly punished, severely, both sides probably also agree that Steiskal's age and social history militate in favor of the joint-recommendation.

- Third, while Steiskal committed a terrible crime, he is appropriately horrified by his behavior and open to treatment—treatment that he desperately longs for and needs. That is, there's a well-founded hope that while he may never heal completely from his childhood wounds, after fifteen years in prison he can be a productive member of society.

Federal Defender Services
   Of Wisconsin, Inc.

Honorable James D. Peterson
March 19, 2019,
Page -2-

Together, those points (as more fully expressed below) should convince the Court that fifteen years is an appropriate sentence.

### 1. There is institutional value in following the parties' joint-recommendation.

We're an extremely adversarial district. The government's plea letters set out few concessions. In return for surrendering fundamental constitutional rights, a person may get a count or two dismissed (if multiple counts are charged) and a third-level reduction (if the plea is signed soon enough), but that's about it. The norm is we just duke it out.

There are, however, a few (very rare) cases where the parties are able to come together and not just resolve the case but resolve it with a joint-recommendation. In my years here, I have had three. In each of those cases, to avoid further litigation and uncertainty, the parties were happy to resolve the case with a joint-recommendation, trusting that the judges would see the value in this rare occurrence and know that it symbolizes more than both sides' shared belief in an appropriate sentence. The joint-recommendation symbolizes each party's trust that Court will see that both sides gave up something to get here, trusting that it not be jumped. There is value to parties' being able to negotiate a settlement that they have confidence will be followed.

Here, the defense did not press with additional motions, forcing the government and the Court to wade into what could come in at trial under the inevitable-discovery doctrine. Putting the litigation to bed early had undeniable value. But that only comes when the parties can trust that the Court will accord appropriate weight to the joint-recommendation. Otherwise, it's of little value. And those few (exceedingly few) cases where litigation is put to rest for a joint-recommendation will fall away, and the result will be yet even more motions and even more trials, which proves wasteful and costly.

All that is to echo and reinforce what this Court once observed (I am paraphrasing) when I came before it with another joint-recommendation: "when Ms. Altman and Mr. Bugni finally agree on something, it's worth taking note and following." In that case (the last case where I had a joint-recommendation), my client was just released from prison—after serving five years. And the certainty provided by that prior case is what allowed the defense in *this* case to surrender further litigation, which could have resulted in Steiskal's acquittal, in favor of a joint-recommendation.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -3-

### 2. The joint-recommendation makes the most sense when its viewed in through the lens of Steiskal's social history.

The PSR gives a taste of Steiskal's upbringing, with allusions to CPS reports and statements by family members. The next five pages and the attached statements from his aunts give those references needed context. To be clear, he had an inauspicious start. His mom's mental-health struggles were exacerbated by a terrible marriage. While pregnant with Andrew, she twice tried to kill herself. And after he was born, she struggled with depression and erratic behavior, which included kidnapping Andrew for several weeks, until she returned and abandoned him.

From all accounts, Andrew's father was not a good man or a good father. Forced to raise Andrew by himself, he moved in with his parents. There, Andrew was physically and emotionally abused like no one else that I've ever encountered. His is a story of trauma; indeed, the Court can't read the attached statements and think that he does not bear emotional and psychological scars that he didn't choose and didn't deserve.

### a. Andrew weathered the early years of abuse, but the marks of a difficult childhood were still there.

To be quite honest, Andrew's story doesn't neatly fit into a clean and comprehensive narrative. There is, of course, the really hard start. When your mom tries to kill herself, twice, while pregnant with you, it's a pretty sure bet that she wasn't also taking her prenatal vitamins and making sure that Andrew listened to baby-Bach while in utero. And when you're abandoned by her, after being kidnapped, it's very likely he didn't have the advantages of skin-to-skin time and all the other things that are supposed to help a baby or infant not just adjust but thrive. That much goes without saying.

When Andrew's case came in, I set out early with the mitigation work. That meant talking with his aunts (who are just great) and gathering all the records our office could find. His aunts' statements are attached. Unfortunately, one thing that this job has taught me is that rural school districts and mental-health professionals are often not as fastidious with the recordkeeping and retention as their urban counterparts. So we don't have a complete narrative of Steiskal's life, but this chronological chart is what we do have.

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -4-

| Date | Age | Grade | Description |
|---|---|---|---|
| 8/1/1996 | 1 | | Andrew's father, Ronald father files for **DIVORCE from Andrew's mother, Jennifer** |
| 7/20/1998 | | | Jennifer, Driving w/o License |
| 12/17/1998 | 3 | | **Jennifer** gets arrested for **CRIMNAL DAMAGE TO PROPERTY** |
| 10/26/2006 | 11 | 5 | WSAS exam: Reading 75%, Math 73%, proficient. No accommodations. |
| 6/6/2007 | 11 | 5 | Fine. Q1 6 absences and a D in S.S. |
| 10/22/2007 | 12 | 6 | WSAS exam: Reading 81%, Math 64, proficient. No accommodations. |
| 04/2009-06/2009 | | 7 | Report Card: GPA 3.12 |
| 10/9/2008 | 13 | | BIRTHDAY |
| 10/27/2008 | | 7 | WSAS Exam: Advanced in Reading, Proficient in Math |
| 10/26/2009 | 14 | 8 | WSAS exam: Reading 78, Lang 69, Math 56, Science 96 (Advanced), social studies 71. No accommodations. |
| 04/2010-06/2010 | 14 | 8 | Report card: GPA 1.0, Teacher remarks Andrew puts forth poor effort in Social Studies |
| 12/6/2010 | 15 | 9 | **SUSPENDED (2)**: Tobacco |
| 6/7/2010 | | | Reporter states on the CPS record that father "will be quiet on the phone, but has a history of yelling and verbal abuse to Andrew." |
| | | Grade 9, 10 | Report card, B's, C's, D's and F (usually in math or english) |
| 2/14/2011 | | 9 | **SUSPENDED (1)**: Drinking Alcohol on school bus |
| | | | HS Counselor started noticing grades dropping & Truancy patterns |
| 10/3/2011 | 15 | 10 | Officially declared TRUANT by state law |
| 10/24/2011 | 16 | 10 | WSAS Exam: ADVANCED in SCIENCE and SS, Proficient in Reading, Lang art., Math low |
| 9/5/2012 | 16 | 11 | **SUSPENDED (3)**: Tobacco on - Second Day of Junior Year |
| 9/5/2012 | 16 | 11 | Andrew gets **ARRESTED** for Fail to Comply with Officer Attempting to Place in Custody, referred to Juvi |
| 9/12/2012 | 16 | 11 | **SUSPENDED**: Hitting a student |
| 9/16/2011 | 15 | 10 | Father is notified of TRUANCY (4)- requests medical excuse, offers mtg to talk about it |
| 10/7/2012 | 16 | 11 | Reported **Anxiety Attack** |
| 10/8/2012 | 16 | 11 | **RAN AWAY FROM HOME** |
| 10/11/2012 | 17 | 11 | **ARRESTED: THC, Drug para, resisting an Officer** (Says he took the blame for his friends weed). |

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -5-

| Date | Age | Grade | Description |
|---|---|---|---|
| 10/17/2012 | 17 | 11 | First Day Back at School following RUN AWAY. **Anxiety Attack** |
| 10/23/2012 | 17 | 11 | **Initial Assessment for NWJDC: Mental Status Exam:** (Intake for NWJDC) Above average functioning. Memory intact. No perceptual disturbances noted. Insight noted functional. Judgment intact. **Diagnosis: Adjustment Disorder w/ Mizes Disturbance of Emotions and Conduct Chronic., Chronic Motor or Vocal Tic Disorder, Nicotine Dependence, Parent-Child relational problem** |
| 10/29/2012 | 17 | 11 | **Admitted to Northwest Journey**: Child Adolescent Day treatment services: 1 hr/wk Ind. Counseling, 5/day group, Med monitoring monthly and as needed, 2 hrs/wk of rec therapy, 55 mins/day of education, **family counseling DECLINED**, 30min/wk case management, clinical team reviews 1x/month |
| 12/19/2012 | 17 | 11 | **SERVICES REPORT: Mental health services, Parent/child conflict resolution, respite?** Mandated Reporter: **Andrew cutting**, Tac then razor blades. distracts him from emotional pain of father's verbal abuse. Did not want to go home to his father. When he learned he had to, he **became very distraught and was sobbing. Reported requested Welfare Check. Reported suggested respite care but father is not agreeable.** |
| 12/19/2012 | 17 | 11 | **JUNEAU CHILD WELFARE**: reported that present situation is "carving letters/words into body". Seeing counselor 5x/month, but increased now. Medication for depression. Summary: Case will be closed. Spoke with Ron about Hidden Springs Clinic. Referred to HSC for family therapy. |
| 12/19/2012 | 17 | 11 | **CPS Emotional Damage/abuse:** Called to NWJDT. Tack, scratches on knuckles. Father called him "stupid" and "retarded". **"WHY ME"** 1" x 3" long, cut into arm with razor blade. **"HELP ME". Didn't want to go home. Andrew says he will continue to cut if sent home.** |
|  |  | Grade 11 | Failed all classes, sent to Northwest Journey Day Center (NWJDC) |
| 6/7/2012 | 17 | 11 | Reporter states on the CPS record that father **"has a history of yelling and verbal abuse to Andrew."** |

FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -6-

Looking at the chart, early on, he's doing fine. He has some deficits but nothing that augurs problems that couldn't be corrected with a little more attention at school and home. Indeed, he boasted a 3.1 GPA in seventh grade. But then look at eighth grade. And whatever he was previously enduring with little outside evidence of problems just hit him. Between seventh and ninth grade, the wheels came off the bus. He goes from being a solid student to having some real problems; the next five years are marked with falling grades, truancy, running away, and suicide attempts. Those are the labels or the manifestation of what was actually happening in Steiskal's life. What follows are the interstitial details of what led to these behavioral changes.

> b. **Andrew's adolescent years were marked with abuse and failed interventions**.

That chart is telling, and the PSR backs up the facts. We all know that most people have a rough transition into their teenage years—that's just life. And over the coming years, some kids struggle more than others; some run away, some skip school, and some just give up. The *why* for each, who choose that path, is a little different. For Andrew the *why* was what he was suffering at home. He was enduring physical and emotional neglect. His basic needs (food and clothing wise) weren't being met. On top of that, he was enduring daily physical and mental abuse.

To escape it all, he ran away (often); as one aunt put it: "There were numerous times when Andrew would take off from my parents' house where he was living with my brother, because he was constantly getting screamed at. The abuse he was dealing with was horrible." As another noted, "Andrew was like the personal punching bag." This including the fact that "[h]e got yelled at for eating." That's right, if Andrew asked for more, like a modern Oliver Twist, he was screamed at. And this wasn't just when it was him with his dad and his grandparents, this was also when others were around. Usually an outsider's presence will temper a person's outbursts, but not in the Steiskal home.

Naturally, seeing this poor child, who was a verbal and physical "punching bag," family members tried to intercede. His aunts and uncle asked if they could raise Andrew, but his father refused. As one aunt noted, "[i]t completely breaks my heart because after all the years of verbal and physical abuse besides his mental issues like his mom had, this poor kid didn't have much of a chance, and it pisses me off that my sister and I tried so many times to get him out of there and my brother wouldn't allow it." Talking with Andrew's aunts, their regret at not going further is palpable.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -7-

But to be clear, the trauma was not just inside Steiskal's house. In fifth grade (when things were still going ostensibly well for Andrew), his cousin, who was like a brother to Andrew, died. It's at this same time that Andrew developed his chronic motor tic. I am not sure how closely the Court observed Andrew when he was in court, but when he talks and gets excited or nervous he has a terrible tic; when he struggles to make a point his eyes roll into the back of his head and he shakes. It's also around this time (sixth grade) that he learned of his mom's suicide. From the records we have, there's this description: "I remember sitting in the doctor's office, and the doctor asked my dad about my mom. Dad just said, she 'She killed herself,' and never said anything about it ever again." Andrew was 11.

Unfortunately, the problems got worse as he got older. This is from one of his aunts:

> When Andrew was in 7th grade I witnessed one of many arguments between him and his dad. I was outside with my daughter and Andrew came outside and ran off the porch crying. Right behind him was his dad chasing after him. He yelled at Andrew that he better stop running. Once he got a hold of Andrew he grabbed him by the throat. *But then I was told by my mother that if I called the police in "their" family I would be sorry. So then my brother came in and started yelling at me that I needed to get the f--- out. Even though it was my parents' house.* They let him run it. They didn't back me up or Andrew at all. I took my daughter to leave. I asked Andrew if he wanted to come with but of course his dad wouldn't let him. The next day at school when I picked up my daughter I stopped to check on Andrew. They both went to same school. I told him if he wanted to I would go with him to talk to a school counselor or teacher about his dad. *But he was afraid of getting into trouble. So then I asked him if he at least wanted a ride home from school and he said his dad told him he wasn't allowed to be in car with me anymore.*

It's not surprising that in the face of all this that Andrew's life started to spiral out of control when he hit thirteen. The tic, the neglect, and the mental-health issues were the perfect cocktail for being mercilessly bullied at school. It was so bad that one teacher bought him clothes—his father wouldn't bother with getting Andrew appropriate clothes, let alone clean ones. Between problems at home and school, Andrew just stopped attending school. He would ride the bus, but not go into the school. That lasted his freshman year. The chart shows his grades dropping and the truancy problems then.

FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -8-

      Then in his sophomore year, things got even worse. As his aunt tells the story:

> Another incident between Andrew and my brother that I witnessed: An argument started at the dinner table. And of course my brother started his screaming. So Andrew got up to go to his room. I followed as quick as I could because I didn't trust my brother. I'd heard Andrew before up in is room when my brother would go in there and hear Andrew saying "dad don't or dad stop." So I tried to follow as much as I could. *Andrew's dad was screaming at him when I got in there. He picked up a glass table that Andrew had in his room. Not sure why or what he was going to do with it. But it hit the ceiling fan and shattered. I started picking up glass. Even ended up with a couple pieces in my arm. I told Andrew I had most of the glass picked up. My brother didn't hear what I said so he started screaming at me.*

      Around this time, Andrew ran away for a month. CPS got involved but the investigation got resolved after CPS gave his father a flyer for services. It's also during this year that Andrew tried to kill himself and that he started seeing a therapist. As a mandatory reporter, she reached out to CPS with little to nothing being done. Andrew was simply referred to a day-treatment center, in lieu of school. There, he had some initial progress with group therapy, but the problems at home seemed too much.

      By the fall of his junior year, he'd started cutting himself. The problem grew worse and worse, and he eventually carved in his arm, "WHY ME" and "HELP ME." I want to pause there for a minute. Imagine taking a razor blade to your skin, and then think of doing it with each cut that it takes to make an H—three. An E—four. An L—two. And then a P—at least two. Now imagine the inner turmoil and pain it takes to drive a kid to resort to that as a means of communicating his inner most cry—a cry that someone would HELP ME! It speaks volumes. It speaks to the fact that he felt that *no one* would listen to him; it speaks to how bad it was for him; and tragically, it speaks to the basic fact we know about all cutters: the significant pain that came with the cutting was a pacifying distraction from the unbearable pain he felt inside. That pain and helplessness was validated when his dad saw the wounds: he called Andrew "stupid" and "retarded."

      Not surprisingly faced with this, the day treatment facility was concerned about Andrew's home life and called CPS, again. Another visit and he was given another flyer, referring him for further treatment at Hidden Springs. At the end of the meeting, when CPS and the counselors told Andrew that he'd have to return home, he broke down and

FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -9-

sobbed. Apparently, CPS offered his father "respite care" where Andrew would go to a foster family for a finite period of time, but his father refused.

At Christmas of that same year, the abuse reached a climax. Here is how an aunt described it: "My brother and Andrew got into a huge argument as they always did and there was a lot of verbal abuse to Andrew from Ron and Andrew said he was going to kill himself and my brother said, 'go ahead, I don't give a shit. Do it.' So Andrew went out in front of the house and stood on the highway hoping to get hit by a car." She added "the roads were terrible. They were covered in snow and slippery" so a car wouldn't be able to stop. Eventually a policeman intervened and returned Andrew home. I'm sure he would have preferred jail.

While all the signs of abuse were there, little to nothing was done until eventually at 18, Andrew moved out. Given the emotional scarring and his lack of an education, he just drifted, as someone with that background would. He worked as a dishwasher, still cutting, and just surviving. Adding to all the trauma that he experienced at home was the shame over the child pornography that he'd started to view. According to Andrew, he wiped the phone a few times to break from it. Yet with little ability to function and process he eventually did what he did — a truly horrendous crime.

I often think that a person's childhood isn't as persuasive form of mitigation as most attorneys make it. But when the defendant is only 21-22 years old when he commits the crime, and the crime is so closely tied to such a dysfunctional and horrific childhood, then a person's childhood has an undeniable bearing on an appropriate sentence. At Steiskal's age (he's now 23), his character is not set and there is time for him to heal from those wounds — even if his are more severe than most.

> **3. Given all the § 3553(a) factors, a sentence of fifteen years is sufficient but not greater than necessary.**

I want to be clear on this point: nothing truly mitigates what Steiskal did. The crime is just horrendous. Thankfully his daughter is young and will remember nothing of what happened. That doesn't make less of a crime, but it is different from a child who will carry the trauma with her for a lifetime. To be clear, I fully embrace that this crime is terrible. But the issue really isn't whether this is a bad crime (it is); rather, it's whether Steiskal is irredeemable and needs to be punished with more than fifteen years.

FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -10-

      To that end, this much should be apparent: Andrew is a deeply wounded person. Only someone truly evil or truly hurt can do what he did. And there is nothing (other than the crime) that suggests he's evil—sociopathic; instead, everything suggests that he's remorseful, he's broken, and he needs to imprisoned to protect the public and so he can be rebuilt. Only therapy and time will heal the wounds and psychological deficits he bears. And thankfully, as Steiskal heals, society is likewise protected.

      The sad reality of being in a small district and overseeing a small defender's office is that over the past four years or so, I have taken almost all of these hands-on type cases. Ms. Altman is usually my very worthy adversary. And so we have seen a large spectrum of cases involving this behavior. As troubling as this case and all these cases are, there have to be a distinctions drawn between those running a babysitting service so they can molest children, and those who for decades terrorize a whole family, and those who pose as children to get access to other kids (all are allusions to past cases) and what happened here. In truth, Steiskal lacks the capacity for the type of high manipulation and criminal thinking—the type that points to a more nefarious person. Again, this crime is terrible—no denying that—but it's different from others in the steps taken and the planning that he undertook to engage in it.

      After all, you can't read what's recounted above and think that this is a wicked person who just graduated to his eventual end: assaulting an infant. Steiskal is so much different from the others who have been sentenced with this crime. His trauma is just so much more severe, that in this arrest and with this sentence there lie some hope. The hope that he can face these things; he can deal with the trauma in therapy; and when he gets out he can get the help he needs with sex-offender treatment and the probation department to live a productive life.

      Thus, when the Court considers what is a sufficient but not greater than necessary sentence, it should take solace in the fact that fifteen years is a lot of time. It is almost two-thirds of the time Steiskal has been alive. And it will not only stand in line with other sentences for similarly situated individuals, it is also a sentence endorsed by the U.S. Attorney's office. In sum, it has all the hallmarks of being an appropriate sentence.

FEDERAL DEFENDER SERVICES
　OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -11-

### 4. A final word on this sentencing.

The reality is this is a terrible crime, but there is a joint-recommendation and so some of what was recounted above was probably overkill. But Steiskal deserves my best, and I would be wracked with guilt if I mailed it in and he got more than fifteen years. I hope that what's recounted above doesn't just mollify any misgivings the Court has with following the joint-recommendation, but will also shape this Court's final remarks when imposing sentence.

Here, it would be easy for the Court to simply express society's outrage over what Steiskal did and leave it at that. But with the power to imprison Steiskal, this Court is also cloaked with undeniable moral authority. And this Court can use the opportunity in addressing Steiskal to encourage him to use this time and his natural talents to help people and not let this crime or his past define him. But to work hard (extremely hard) at healing and living a virtuous and law-abiding life.

In most cases, I try to truly know my clients. I spend a lot of time with them and try to relate and bond and understand his or her story. One way I do that is assigning them books to read—books that we can print off the internet and send them. And then we talk about the books and the characters and what they liked and didn't like and what they took from the stories—usually the books help them gain insight into the choices that led them here. With Andrew, I didn't opt for a diet of good books; instead, I learned about his interest in drawing and brought him art books. I also encouraged his aunts to buy him some and (as always) they were supportive and generous.

You see, drawing provides Andrew with a healthy bit of self-esteem—he's good at it. While he didn't win the Dane County Jail drawing contest this winter (the prize was pizza for the pod), he did make fifty bucks in commissary by making valentine day cards for the other inmates. Like the reading that most of my client's do, Andrew's art is not just a means of building self-esteem but also a means of helping him process the painful choices that have brought him into the criminal-justice system. One of his better pieces is of a heart that has two wings—one of an angel and the other of a bat. It's well-done, it's different, and it's telling.

I've written all this because I hope that beyond the sentence imposed, that this Court will make a magnanimous gesture at sentencing by encouraging him to vigilantly cultivate and pursue both his artistic talent but also to seek out all the benefits of therapy that prison can offer him—especially sex-offender treatment. I am confident that this

FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.

Honorable James D. Peterson
March 19, 2019,
Page -12-

Court's words will not fall on deaf ears but resonate with Andrew over the next fifteen years and possibly beyond.

A final note about the attachments, when all the mitigation documents were coming in, I had his aunts write emails about what they witnessed and remembered from Andrew's childhood. I remembered them being in the form of letters; but when I prepared this sentencing memorandum, I realized that they are just notes and statements that were sent to us. Unfortunately, I did not start writing this until yesterday—last week was filled with some all-consuming cases. So in a matter of a day, I could not reasonably expect his aunts to reformat and edit what they'd given me to make them into letters for the Court. Thus, the attachments are less letters appealing for mercy, and more the validation of all the statements made in this memo. His aunts will be at sentencing, if the Court has any follow-up questions or concerns about the veracity of their statements.

                              Sincerely,

                              */s Joseph A. Bugni*

                              Joseph A. Bugni
                              Associate Federal Defender